Roger BOTT, Plaintiff, Appellant,
and Cross–Appellee,

v.

Gary W. DeLAND, Blen Freestone, Dean
Laney, and Robert F. Powell, Defen-
dants, Appellees, and Cross–Appellants.

No. 930387.

Supreme Court of Utah.

July 12, 1996.

Ross C. Anderson, Steven W. Dougherty, Salt Lake City, for plaintiff.

Jan Graham, Atty. Gen., Elizabeth King, Carol Clawson, Asst. Attys. Gen., Salt Lake City, for defendants.

HOWE, Justice:

Plaintiff Roger Bott appeals from the district court's judgment that the Utah Governmental Immunity Act, Utah Code Ann. § 63–30–34(1)(a) & (b), limits to $250,000 his recovery of personal injury damages against defendants Department of Corrections Executive Director Gary DeLand, Utah State Prison Medical Administrator Blen Freestone, and Dean Laney, a nurse practitioner at the prison. Defendants cross-appeal from judgments against Laney for negligence and against DeLand, Freestone, and Laney for their violation of article I, section 9 of the Utah Constitution.

Bott became an inmate at the Utah State Prison on October 5, 1987. After almost two years of incarceration, he began experiencing blurred vision in his right eye. He reported this condition to a prison medical technician, and the technician informed Laney of Bott's complaint. A few days later, Laney examined Bott's eyes, determined that his condition was not serious, and placed him on a waiting list to see an optometrist. During the next four weeks, the vision in both of his eyes steadily worsened until he lost all of the vision in his right eye and most of the vision

in his left. He also suffered from increasingly severe headaches, nausea, dizziness, and body aches. Bott asserts that although he complained repeatedly of these symptoms to the medical technicians and to Laney, they did not adequately examine him or inform a physician of his condition. In accordance with prison procedure, he submitted a grievance concerning his lack of medical attention to the appropriate correctional officer. Two weeks later, with the help of another inmate, he filed another grievance, complaining that he still had not received any medical attention. However, nearly another two weeks passed before he was examined by an optometrist. The optometrist observed signs of hemorrhaging in Bott's retina and sent him directly to the University of Utah Medical Center, where he was diagnosed with malignant hypertension and severe renal failure. By the time of the trial, he was dependent upon hemodialysis three times each week, and his life expectancy had allegedly greatly diminished.

Bott initiated two actions against defendants. The first was an action against Laney for negligently failing to examine him, notify physicians of his condition, and treat him prior to the onset of malignant hypertension and severe renal failure. The second was an action against DeLand, Freestone, Laney, and Robert F. Powell, who is not part of this appeal. That action alleged a claim for damages under the "unnecessary rigor" clause, article I, section 9 of the Utah Constitution, and under 42 U.S.C. § 1983 for the violation of Bott's right to be free from cruel and unusual punishments under the Eighth Amendment of the United States Constitution. The district court consolidated these two actions and conducted a jury trial. The jury found that Laney was negligent, causing Bott to suffer $490,000 in damages. The jury also found that Laney, DeLand, and Freestone violated Bott's rights under article I, section 9 of the Utah Constitution and, as a result, Bott suffered $490,000 in damages.[1] In rendering its judgment, the trial court limited Bott's total recovery to $250,000, the maximum amount that a plaintiff may recover from government employees under the Governmental Immunity Act. Utah Code Ann. § 63-30-34(1)(a) & (b).

Bott appeals, making several constitutional and statutory arguments against the application of the statutory cap on damages. Before addressing these arguments, however, we will examine the issues raised by defendants in their cross-appeal. Their first contention is that statutory governmental immunity applies to shield them from Bott's negligence and state constitutional actions. Their second argument is that article I, section 9 of the state constitution cannot be the basis of an award of monetary damages. We examine each of these issues separately.

## I. STATUTORY GOVERNMENTAL IMMUNITY FOR NEGLIGENCE

Defendants contend that under subsections 63-30-4(3) and (4) of the Governmental Immunity Act, they cannot be personally liable to Bott for damages under either the negligence theory or the state constitutional theory unless they acted with fraud or malice. *See Maddocks v. Salt Lake City Corp.*, 740 P.2d 1337, 1339 (Utah 1987); *Lancaster v. Utah State Prison*, 740 P.2d 261, 262 (Utah 1987). The court below rejected that argument, ruling that subsections 63-30-4(3) and (4) violated the open courts clause of the Utah Constitution, Utah Const. art. I, § 11.

■ We initially dispose of Bott's contention that defendants did not preserve the issue of governmental immunity for appeal. As defendants point out, Laney's first response to the negligence action was to move for dismissal on the basis of governmental immunity. The trial court denied this motion when it ruled that subsections 63-30-4(3) and (4) were unconstitutional. Meanwhile, in the action for damages under the state and federal constitutions, DeLand, Freestone, and Laney pleaded the defense of immunity in their answer to the amended complaint. After the court consolidated the claims, held trial, and received the jury's verdict, defendants again raised the issue of governmental

---

1. Bott stipulated that to avoid double recovery, he was entitled to only one judgment of $490,000.

immunity in their memorandum in support of judgment notwithstanding the verdict. The court again refused to apply governmental immunity. Thus, defendants, who appeal from all of these orders, properly preserved the issue of governmental immunity for appeal.

## A. The Negligence Claim

■ In arguing that governmental immunity does not shield Laney from the negligence action, Bott asserts that this court should affirm the trial court's ruling that subsections 63–30–4(3) and (4) are unconstitutional because they violate the open courts clause, article I, section 11, the due process clause, article I, section 7, and the uniform operation of laws clause, article I, section 24 of the Utah Constitution. We have already addressed these arguments in *Ross v. Schackel,* 920 P.2d 1159 (Utah 1996), also issued today, and have determined that these subsections are constitutional as applied to prisoners' negligence actions against prison physicians. Bott's claim against Laney differs from the plaintiff's claim in *Ross* only in that Laney is a nurse practitioner, not a physician. Although prison physicians arguably enjoy a higher status within the prison employment system than nurse practitioners, we conclude that this difference does not prevent us from applying the constitutional analysis advanced in *Ross.*

In *Ross,* we held that subsections 63–30–4(3) and (4) do not violate the open courts clause because they did not abrogate a remedy available to prisoners at common law. We find no basis for distinguishing Laney's position from the position of the prison physician in *Ross,* and thus we conclude that Bott could not have maintained a negligence action against Laney at common law and that subsections 63–30–4(3) and (4) are constitutional under the open courts clause.

Our analysis of these subsections in *Ross* under the due process and uniform operation of laws clauses also applies in this case. Laney's position as a nurse practitioner does not alter either the standards of review or the statutory objectives upon which we based our analysis in *Ross,* and Bott does not present any arguments that we did not consider

in that case. Therefore, we reverse the trial court's judgment in favor of Bott on the issue of Laney's negligence.

## B. The State Constitutional Claim

■ Next, we examine whether governmental immunity shields DeLand, Freestone, and Laney from Bott's action under the "unnecessary rigor" clause of the Utah Constitution, article I, section 9. As with the negligence claim, Bott asserts that subsections 63–30–4(3) and (4) should not be applied because doing so would violate the open courts clause. We agree that these subsections should not be applied, but we do not base our conclusion upon the open courts clause. Quite simply, we decline to apply these subsections because they constitute an unreasonable regulation of Bott's article I, section 9 right to be free of "unnecessary rigor."

■ "[A]ny rule or regulation in regard to the remedy which does not, under pretense of modifying or regulating it, take away or impair the right itself, cannot be regarded as beyond the proper province of legislation." 2 Thomas M. Cooley, *Constitutional Limitations* 756 (1927). However, the legislature's "fraud or malice" standard contained in subsections 63–30–4(3) and (4) impairs article I, section 9 rights because it does bar claims that would otherwise be allowed under the standards that we will subsequently discuss. Moreover, governmental immunity cannot apply where a claimant alleges that the state or a state employee violated his constitutional rights. *Colman v. Utah State Land Bd.,* 795 P.2d 622, 630–35 (Utah 1990); *Wickham v. Fisher,* 629 P.2d 896, 900–01 (Utah 1981); *Burdette v. State,* 166 Mich.App. 406, 421 N.W.2d 185, 186 (1988); *Terranova v. State,* 111 Misc.2d 1089, 445 N.Y.S.2d 965, 969 (1982) ("However [the state's police power] must be exercised reasonably ... and with scrupulous regard for constitutionally guaranteed rights."). *But see Figueroa v. State,* 61 Haw. 369, 604 P.2d 1198, 1205 (1979); *Medina v. State,* 871 P.2d 1379, 1386 (Okla. 1993). As the Michigan court of appeals explained: "Constitutional rights serve to restrict government conduct. These rights would never serve this purpose if the state could use governmental immunity to avoid

constitutional restrictions." *Burdette,* 421 N.W.2d at 187. Thus, we decline to apply the "fraud or malice" standard of subsections 63–30–4(3) and (4) to Bott's article I, section 9 claim.

## II. MONETARY DAMAGES FOR THE VIOLATION OF THE UNNECESSARY RIGOR CLAUSE OF THE UTAH CONSTITUTION

■ Defendants next contend that article I, section 9 cannot be the basis for a recovery of damages against them. Article I, section 9 provides:

> Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. Persons arrested or imprisoned shall not be treated with unnecessary rigor.

It has been recognized that the guarantee against cruel and unusual punishment focuses specifically on the methods or conditions of punishment, while the guarantee against unnecessarily rigorous treatment extends both to prisoners and to arrestees and protects them against unnecessary abuse. *Sterling v. Cupp,* 290 Or. 611, 625 P.2d 123, 129–30 (1981). *See generally Wickham,* 629 P.2d at 901; *Bonahoon v. State,* 203 Ind. 51, 178 N.E. 570, 571 (1931). However, this court has seldom found occasion to examine the full import of these guarantees, and the issue of whether a court can award a claimant damages for the violation of these guarantees is one of first impression.

■ Article I, section 9 may provide the basis for an award of damages if it is a self-executing provision—which traditionally allows courts to award injunctions and invalidate conflicting statutes—and if it furnishes sufficient authority for remedies of money damages. Courts have developed the concept of self-execution as a means of determining whether a constitutional provision

may be enforced without implementing legislation. A constitutional provision is self-executing if it articulates a rule sufficient to give effect to the underlying rights and duties intended by the framers. *Davis v. Burke,* 179 U.S. 399, 403, 21 S.Ct. 210, 211–12, 45 L.Ed. 249 (1900). In other words, courts may give effect to a provision without implementing legislation if the framers intended the provision to have immediate effect and if "no ancillary legislation is necessary to the enjoyment of a right given, or the enforcement of a duty imposed." *In re Montello Salt Co.,* 88 Utah 283, 288–89, 53 P.2d 727, 729 (1936). In addition, the fact that the legislature may enact supplementary legislation to further protect or regulate a right in a constitutional provision does not prevent the provision from being self-executing. *People v. Western Air Lines,* 42 Cal.2d 621, 268 P.2d 723, 732 (1954), *appeal dismissed by Western Air Lines, Inc. v. People of State of California,* 348 U.S. 859, 75 S.Ct. 87, 99 L.Ed. 677 (1954); *General Agriculture Corp. v. Moore,* 166 Mont. 510, 534 P.2d 859, 862 (1975). Conversely, constitutional provisions are not self-executing if they merely indicate a general principle or line of policy without supplying the means for putting them into effect. *In re Montello Salt,* 53 P.2d at 729.

■ Article I, section 9 is a self-executing provision. This provision does more than state general principles; it prohibits specific evils that may be defined and remedied without implementing legislation. Indeed, this court has already defined and enforced this provision without the aid of legislation. *See, e.g., Wickham,* 629 P.2d at 901. Also, the history of the provision indicates that the framers most likely intended it to have immediate effect without implementing legislation. It was drafted on the basis of similar state and federal cruel and unusual punishment clauses that arose from the English Bill of Rights of 1689,[2] which actively and immediately proscribed tortures and other barbar-

---

2. Some scholars trace the philosophical underpinnings of cruel and unusual punishment clauses to the Old Testament, which described the Judeo–Christian law as embodying the concept of " '[e]ye for eye, tooth for tooth.' " Arthur B. Berger, *Wilson v. Seiter: An Unsatisfying Attempt at Resolving the Imbroglio of Eighth Amendment*

*Prisoners' Rights Standards,* 1992 Utah L.Rev. 565, 567 (quoting Exodus 21:24 (King James)). This concept of proportionality and fixed punishment also appeared in the writings of Aristotle and in Anglo–Saxon, Germanic, and Norse law. *Id.* at 567.

ic practices and was enforced without further definition by parliament. *Gregg v. Georgia,* 428 U.S. 153, 169–70, 96 S.Ct. 2909, 2923–24, 49 L.Ed.2d 859 (1976) (citing Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning,* 57 Cal. L.Rev. 839, 852–53 (1969)). Like the English courts, American state and federal courts have interpreted and applied cruel and unusual punishment clauses without the aid of legislation. *See, e.g., Estelle v. Gamble,* 429 U.S. 97, 103–06, 97 S.Ct. 285, 290–92, 50 L.Ed.2d 251 (1976) (giving effect to federal cruel and unusual punishment clause without implementing legislation); *Naked City, Inc. v. State,* 460 N.E.2d 151, 161 (Ind.Ct.App. 1984) (giving effect to the Indiana cruel and unusual punishment clause without implementing legislation). Further, this provision is a prohibitory provision, and such provisions are usually self-executing at least to the extent that courts may void incongruous legislation. *Western Air Lines,* 268 P.2d at 732; *Alper v. Clark County,* 93 Nev. 569, 571 P.2d 810, 811 (1977); *State ex rel. Stafford v. Fox-Great Falls Theatre Corp.,* 114 Mont. 52, 132 P.2d 689, 700 (1942); *Pederson v. Moser,* 99 Wash.2d 456, 662 P.2d 866, 869 (1983).

Having determined that article I, section 9 is self-executing, we must now determine whether self-executing clauses provide an adequate basis for a recovery of damages. The decisions of other courts on this issue vary widely. While the states are divided, the United States Supreme Court has held that self-executing federal constitutional provisions may be the basis for an award of money damages. In the landmark ruling *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 407, 91 S.Ct. 1999, 2010, 29 L.Ed.2d 619 (1971), the Court allowed a claimant to recover damages from federal narcotics agents directly under the Fourth Amendment for the violation of his right against unreasonable searches and seizures. Later, in *Carlson v. Green,* 446 U.S. 14, 17, 24, 100 S.Ct. 1468, 1470–71, 1474, 64 L.Ed.2d 15 (1980), the Court extended this ruling to allow a deceased prisoner's mother to recover damages from prison officials for violating her son's Eighth Amendment right against cruel and unusual punishments. However, federal courts have acknowledged

that the ruling in *Carlson* does not "constitutionalize" prisoners' tort actions. Rather, a prisoner may recover damages for inadequate medical care only upon a showing of "deliberate indifference," as defined by the United States Supreme Court in *Estelle,* 429 U.S. at 103–06, 97 S.Ct. at 290–92. *Carlson,* 446 U.S. at 17, 100 S.Ct. at 1470–71; *Shapley v. Nevada Bd. of State Prison Comm'rs,* 766 F.2d 404, 406 (9th Cir.1985); *Mosby v. Mabry,* 697 F.2d 213, 215 (8th Cir.1982); *West v. Keve,* 571 F.2d 158, 161 (3d Cir.1978).

State courts have taken several different approaches in interpreting state constitutional provisions. Some courts entirely reject attempts to recover damages for the violation of state constitutional rights. *Medina,* 871 P.2d at 1385; *Figueroa,* 604 P.2d at 1205. Others have followed the United States Supreme Court and have allowed recovery under state cruel and unusual punishment clauses upon a showing of deliberate indifference. *Naked City,* 460 N.E.2d at 160–61. Some courts have held that while money damages are available for constitutional violations, government employees are entitled to good faith immunity if their challenged actions were not in violation of any clearly established constitutional right as articulated in case law. *Moresi v. Department of Wildlife & Fisheries,* 567 So.2d 1081, 1094 (La. 1990). Other courts allow claimants to collect damages from government employees upon a showing of intentional, reckless, or careless disregard or fraud or misdoing. *Bull v. Armstrong,* 254 Ala. 390, 48 So.2d 467, 470 (1950); *Jackson v. Hartford Accident & Indem. Co.,* 484 S.W.2d 315, 319 (Mo.1972).

The only common feature of all of these cases is that they hold that simple negligence is not sufficient justification for a damage claim. *But see Widgeon v. Eastern Shore Hosp. Ctr.,* 300 Md. 520, 479 A.2d 921, 923 (1984).

■ After examining the reasoning of courts that have ruled on the issue of whether self-executing provisions allow awards of money damages, we find those cases allowing awards to be more persuasive. In recognizing a claim for money damages under the

Fourth Amendment, Justice Brennan, writing for the United States Supreme Court asserted:

> [I]t must ... be recognized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities; at the very least, it strikes me as no more appropriate to await express congressional authorization of traditional judicial relief with regard to these legal interests than with respect to interests protected by ... statutes.

*Bivens,* 403 U.S. at 407, 91 S.Ct. at 2010. We agree. The history of individual rights as embodied in the Magna Charta and other fundamental documents supports this view. Under English law, individuals had access to remedies of money damages for violations of their individual rights, *Moresi,* 567 So.2d at 1092; *Widgeon,* 479 A.2d at 924 (citing *Entick v. Carrington,* 19 How. St. Tr. 1029 (1765); *Wilkes v. Wood,* Lofft's 1, 98 Eng. Rep. 489 (1763); *Huckle v. Money,* 2 Wils. 205, 95 Eng. Rep. 768 (1763)), and these rights, enumerated in fundamental documents, were the forerunners of many of the provisions adopted in federal and state bills of rights. Thus, the framers of the Utah Constitution, who adopted article I, section 9 against this background, most likely contemplated an award of money damages for the violation of these rights. We also recognize that if prisoners' rights under article I, section 9 are violated, injunctive relief may not be adequate to remedy prisoners' injuries. We cannot deny such prisoners monetary relief simply because many jurisdictions have not clearly established that such relief is available for the violation of constitutional rights. Thus, we conclude that self-executing constitutional provisions allow for awards of money damages.

 Next, we must determine whether self-executing provisions provide a basis for an award of damages against state employees or only from the state. In arguing against a recovery of damages from state employees, defendants assert that courts have never allowed recovery against private individuals without implementing legislation. Defendants point out that "it took an act of

Congress in the form of the 'Klu Klux Klan Act' of 1871 to provide a tort-like remedy for the violation of a citizen's rights under the United States Constitution" (citing *Monroe v. Pape,* 365 U.S. 167, 170–71, 81 S.Ct. 473, 475–76, 5 L.Ed.2d 492 (1961), *overruled on other grounds by Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). We acknowledge that in cases involving sexual or racial discrimination by private businesses and institutions, this court, along with other courts, has refused to impose liability in the absence of implementing legislation. *See Beehive Medical Elecs. v. Industrial Comm'n,* 583 P.2d 53, 59 (Utah 1978); *Armwood v. Francis,* 9 Utah 2d 147, 150, 340 P.2d 88, 90–91 (1959); *de la Ysla v. Publix Theatres Corp.,* 82 Utah 598, 604, 26 P.2d 818, 820 (1933). However, we reject defendants' argument for two reasons. First, the cases cited by defendants did not involve self-executing constitutional provisions such as article I, section 9. *Carlson,* 446 U.S. at 17, 24, 100 S.Ct. at 1470–71, 1474; *Moresi,* 567 So.2d at 1094; *Naked City,* 460 N.E.2d at 161. Second, state employees cannot be categorized as purely private individuals because they have a unique capacity to harm which private individuals do not have. We recognize that "injuries inflicted by officials acting under color of law are substantially different in kind than those inflicted by private parties." *Moresi,* 567 So.2d at 1093. The actions of officials are apparently authorized by the law, and an "agent acting ... in the name of the state possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own." *Id.* This is particularly true in the case of prisoners, who have no choice but to accept the actions of officials that directly affect their daily lives. *Gregg v. Georgia,* 428 U.S. at 169–73, 96 S.Ct. at 2923–25; *Sampley v. Ruettgers,* 704 F.2d 491, 494–95 (10th Cir. 1983). Thus, we find that prisoners may collect damages from prison employees for the violation of their rights under article I, section 9.

Although we hold that prisoners are entitled to recover damages from prison employees, it does not follow that employees may be held liable for any injury. A prison employee's "lot is not so unhappy" that he cannot

**740**

possess any human frailties of forgetfulness, distractibility, or misjudgment without rendering himself liable for a constitutional violation. *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). Neither must he "choose between being charged with dereliction of duty" if he does not carry out the instructions of his superiors and "being mulcted in damages [for a constitutional violation] if he does." *Id.* To engender liability, an employee's conduct must be voluntary and sufficiently culpable to contravene a prisoner's right to be free from cruel and unusual punishments and unnecessary rigor.

■ We hold that a prisoner may not recover damages under article I, section 9 unless he shows that his injury was caused by a prison employee who acted with deliberate indifference or inflicted unnecessary abuse upon him. The deliberate indifference standard protects prisoners from cruel and unusual punishments, and the unnecessary abuse standard protects prisoners from unnecessary rigor. *See* Utah Const. art. I, § 9. We explore each of these standards separately.

■ The deliberate indifference standard differentiates between inadvertent misconduct, which does not give rise to liability under article I, section 9, and the "unnecessary and wanton infliction of pain," which does. *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291–92. For example, a physician who is guilty of medical malpractice is not guilty of a constitutional violation "merely because the victim is a prisoner." *Id.* at 106, 97 S.Ct. at 292; *El'Amin v. Pearce,* 750 F.2d 829, 832 (10th Cir.1984); *Brown v. Schiff,* 614 F.2d 237, 239 (10th Cir.1980). Similarly, a prison worker's inadvertent failure to provide adequate medical care would not support a constitutional claim for damages. *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291–92; *Olson v. Stotts,* 9 F.3d 1475, 1476–77 (10th Cir.1993); *Daniels v. Gilbreath,* 668 F.2d 477, 488 (10th Cir.1982). Moreover, a prison worker would not be liable for failing to administer unnecessary medical treatment desired by an inmate, such as female hormone therapy requested by a transsexual inmate, *Supre v. Ricketts,* 792 F.2d 958, 963 (10th Cir.1986), or treatment for nonexistent claustrophobia and

agoraphobia. *Frohmader v. Wayne,* 958 F.2d 1024, 1028 (10th Cir.1992). Finally, a prison official would not be liable for a decision "necessarily made in haste, under pressure, and ... without the luxury of a second chance." *Berry v. City of Muskogee,* 900 F.2d 1489, 1495 (10th Cir.1990) (citing *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986)).

On the other hand, a prison physician would be liable under the deliberate indifference standard for choosing an " 'easier and less efficacious treatment' " than professional judgment dictates, such as "throwing away the prisoner's [viable] ear and stitching the stump." *Estelle,* 429 U.S. at 104 n. 10, 97 S.Ct. at 291 n. 10 (quoting *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974)). A physician would also be liable for refusing to treat a prisoner's allergic reaction to a drug after administering the drug with knowledge of the prisoner's allergy. *Id.* Likewise, prison guards would be liable for intentionally denying or delaying access to medication or medical treatment. *Id.* at 105, 97 S.Ct. at 291–92.

■ Unlike the deliberate indifference standard, the unnecessary abuse standard has not been widely explored. This standard was pioneered by the Oregon Supreme Court under the unnecessary rigor clause of the Oregon Constitution, article I, section 13. The court, noting that the heart of the unnecessary rigor provision was its ability to embody evolving touchstones of humanity, based this standard upon internationally accepted standards of humane treatment as articulated in the Universal Declaration of Human Rights, the International Covenant of Civil and Political Rights, and the Standard Minimum Rules for the Treatment of Prisoners adopted by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders in 1955. *Sterling,* 625 P.2d at 131. Under this standard, the main consideration is "whether a particular prison or police practice would be recognized as an abuse to the extent that it cannot be justified by necessity." *Id.* at 130. The definition of "abuse" focuses on "needlessly harsh, degrading, or dehumanizing" treatment of prisoners. *Id.* at 131. For example,

although police may use "reasonable and necessary force" in making an arrest, the prohibition against unnecessary rigor does not allow police officers to commit assault and battery on a criminal suspect. *Bonahoon*, 178 N.E. at 571. The Oregon Supreme Court has further noted that the unnecessary rigor standard does not apply to the quality of the charges that bring a defendant into custody, only to the conditions of his incarceration. *State v. Moen*, 309 Or. 45, 786 P.2d 111, 142 (1990). We emphasize that unnecessary rigor must be treatment that is clearly excessive or deficient and unjustified, not merely the frustrations, inconveniences, and irritations that are common to prison life.

 Having established the applicable standards of liability under article I, section 9, we address defendants' argument that jury instruction 43 allowed the jury to find liability merely on the basis of a deviation from the accepted standard of care in the medical community, rather than on a finding of "deliberate indifference" or "unnecessary abuse." In examining the record, we find that jury instruction 43 was intended solely as an instruction on the issue of proximate causation and that the trial court articulated the deliberate indifference and the unnecessary abuse standards in jury instructions 68 and 69. *See State v. Johnson*, 774 P.2d 1141, 1146 (Utah 1989) (explaining that jury instructions must be read and evaluated as a whole). As we have repeatedly held, if the jury instructions as a whole fairly instruct the jury on the applicable law, reversible error does not arise merely because one jury instruction, standing alone, is not as accurate as it might have been. *State v. Brooks*, 638 P.2d 537, 542 (Utah 1981). Although defendants objected to instructions 68 and 69 in the trial court, they have not assigned the instructions as being in error nor have they argued this point in their brief on appeal. Where an appellant fails to brief an issue on appeal, the point is waived. *Reid v. Anderson*, 116 Utah 455, 455, 211 P.2d 206, 206 (1949). Consequently, we will not examine those instructions for error.

## III. STATUTORY CAP

The final issue is whether the trial court properly interpreted and then applied the statutory cap on damages, Utah Code Ann. § 63–30–34(1)(a) & (b), to limit Bott's jury award of $490,000 on his constitutional claim to $250,000. At the outset, we observe that these subsections are contained in the Governmental Immunity Act and arguably were not intended by the legislature to cap damages awardable for violations of constitutional rights but were meant only to cap damages recovered under provisions of the Act. However, because none of the parties have briefed or argued that theory, we will assume without deciding that it was the legislative intent that the damage cap apply to all recoveries against a governmental entity for personal injuries.

Bott contends that the trial court misinterpreted subsections 63–30–34(1)(a) and (b) and that as so interpreted and applied, these subsections are unconstitutional under article I, sections 7, 11, 12, and 24, article 5, and article 6, section 26 of the Utah Constitution. Because constitutional issues should not be decided unless they are squarely before the court, 1 Thomas M. Cooley, *Constitutional Limitations* 388 (1927), we will determine whether the trial court misinterpreted and thus misapplied these subsections before we address the constitutional issues.

### A. Statutory Construction

Subsections 63–30–34(1)(a) and (b) provide:

(a) ... [I]f a judgment for damages for personal injury against a governmental entity, or an employee whom a governmental entity has a duty to indemnify, exceeds $250,000 for one person in any one occurrence, or $500,000 for two or more persons in any one occurrence, the court shall reduce the judgment to that amount.

(b) A court may not award judgment of more than $250,000 for injury or death to one person regardless of whether or not the ... function giving rise to the injury is characterized as governmental.

The trial court, in examining whether these subsections limit Bott's recovery, "presume[d] that the legislature intended that more than one occurrence means two distinct and separate injuries such as the defendant

causing plaintiff to suffer a broken leg and then in the treatment of the broken leg, defendant's doctor failing to set the leg properly." The court held that although Bott's renal failure may have been the result of both Laney's negligence and the prison administration's failure to have a quality control program in place, the statutory cap applied because Bott suffered only one injury.

Bott argues that the trial court erred in interpreting the term "occurrence" as referring to the number of injuries rather than to the number of causes leading to the injury. He asserts that a substantial number of courts, in examining similar statutes, have interpreted "occurrence" as referring to the number of causes of an injury (citing *Wiltshire v. Government of Virgin Islands*, 893 F.2d 629, 633–35 (3d Cir.1990); *Home Indem. Co. v. Anders*, 459 So.2d 836, 843 (Ala. 1984); *Arizona Property & Casualty Ins. Guar. Fund v. Helme*, 153 Ariz. 129, 735 P.2d 451, 457 (1987)). Defendants counter that a substantial number of courts have interpreted "occurrence" as referring to the number of injuries (citing *Guaranty Nat'l Ins. Co. v. North River Ins. Co.*, 909 F.2d 133, 138 (5th Cir.1990); *Gibbs v. Armovit*, 182 Mich.App. 425, 452 N.W.2d 839, 840 (1990)).

■ Although case law from other courts is persuasive, it is not controlling in our interpretation of subsections 63–30–34(1)(a) and (b), and we must conduct an independent examination of these subsections according to the rules of statutory construction. Under these rules, we must presume that the legislature used each word advisedly, and we give effect to each word according to its commonly accepted meaning. *Versluis v. Guaranty Nat'l Cos.*, 842 P.2d 865, 867 (Utah 1992). When interpreting an ambiguous term, we look to the legislative history and the purpose of the statute as a whole to give effect to legislative intent. *Sullivan v. Scoular Grain Co. of Utah*, 853 P.2d 877, 880 (Utah 1993).

■ The commonly accepted meaning of "occurrence" is a happening or an event. *Black's Law Dictionary* 974 (5th ed.); *American Heritage Dictionary* 475 (2d ed.). Thus we do not interpret the term as referring to the number of injuries sustained by a claimant or the number of causes that contributed to the injuries; we interpret it as referring to the number of causes that inflicted completely separate injuries. For example, a plaintiff who was hit by a state snow plow, rescued by an ambulance, and then injured further when the ambulance was hit by a state dump truck may collect damages for two occurrences. However, a plaintiff may not receive damages for two occurrences after sustaining multiple injuries solely from being hit by a state snow plow or after sustaining one injury from being hit by a state snow plow and a state dump truck at the same time.

This interpretation is supported by the meaning of the statute as a whole, which aids us by referring to awards of damages in several contexts. For example, subsection 63–30–34(1)(b) states that not more than $250,000 may be awarded "for injury or death to one person." Because this phrase contemplates a $250,000 cap for injury or death without regard to the number of causes, we cannot interpret the term "occurrence" as allowing a separate $250,000 cap for each contributing cause or for alternative causes of injury or death.

■ Likewise, we cannot interpret the term as allowing a separate $250,000 cap for each injury. Subsection 63–30–34(1)(a) states that a judgment may not exceed "$250,000 for one person in any one occurrence, or $500,000 for two or more persons in any one occurrence." This phrase contemplates that although more than two people may each receive an injury from the same cause, the maximum that they may collectively receive is $500,000. Clearly, the legislature did not intend to award a maximum of $250,000 for each injury. Thus, we find in examining the statute as a whole that the legislature intended to bar a claimant from collecting more than $250,000 unless the claimant received separate injuries from clearly separate causes, and this amount may not be increased by the number of causes contributing to a single injury, the duration of the cause of the injury, or the number of injuries resulting from one particular cause.

■ Bott argues that even if we reject his argument that the term "occurrence" re-

fers to the number of causes of an injury, his recovery should not be limited to $250,000 because the statutory cap applies to the judgment against each defendant found to be liable rather than to the total recovery. He points out that subsection 63–30–34(1)(a) provides that if a judgment for damages against "a governmental entity, or *an employee* . . . exceeds $250,000 for one person in any one occurrence," the judgment shall be reduced. (Emphasis added.) We find Bott's interpretation to be contrary to the intent of the legislature. The language of subsections 63–30–34(1)(a) and (b) *focuses on the statutory cap as it applies to the claimant*, not as it is apportioned among individual employees. The language referring to judgments against "a governmental entity, or an employee" simply emphasizes the provision of section 63–30–20 prohibiting claimants from collecting damages from a governmental entity and a governmental employee for the same claim. Thus, we decline to rule that the statutory cap applies to the judgment against each individual defendant.

Finally, Bott argues that the statutory cap should not apply because DeLand is no longer employed by the Department of Corrections and defendants did not show that they are employees "whom a governmental entity has a duty to indemnify" as required by subsection 63–30–34(1)(a). We find these arguments to be meritless. All the defendants were employed by the Department of Corrections at the time the relevant events occurred, and the State of Utah is statutorily obligated to pay the judgments entered against them. Therefore, we conclude that the trial court properly interpreted subsections 63–30–34(1)(a) and (b).

### B. Constitutional Validity

■ Next, we examine the constitutionality of subsections 63–30–34(1)(a) and (b) as applied in this case. We have already held that these subsections are constitutional under article I, sections 7, 10, 11, and 24 of the Utah Constitution as applied to judgments for injuries resulting from a governmental entity's failure to maintain safe road conditions. *McCorvey v. Utah State Dep't of Transp.*, 868 P.2d 41, 48 (Utah 1993). Conversely, we have held that these subsections are unconstitutional as applied to a damage cap on a judgment for a University Hospital patient. *Condemarin v. University Hosp.*, 775 P.2d 348, 366 (Utah 1989). In this case, Bott argues that these subsections violate article I, sections 7, 11, 12, and 24, article 5, and article 6, section 26 of the Utah Constitution. However, we need not reach these arguments because subsections 63–30–34(1)(a) and (b) are more appropriately analyzed as a legislative regulation of Bott's article I, section 9 rights.

■ Although "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948), "a prisoner is not wholly stripped of constitutional protections when he is imprisoned for a crime." *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). Certainly, prisoners maintain their article I, section 9 rights, and the legislature may not abrogate or arbitrarily infringe upon these rights under the auspices of its lawful power to promote the public health, safety, and general welfare of its citizens. However, this does not mean that these rights are not subject to regulation. All constitutional rights, including the highly protected right of free speech, are subject to reasonable regulation. *Redding v. Jacobsen*, 638 P.2d 503, 509 (Utah 1981); *Slater v. Salt Lake City*, 115 Utah 476, 483, 206 P.2d 153, 157 (1949); *International Union of Operating Eng'rs v. Utah Labor Relations Bd.*, 115 Utah 183, 190, 203 P.2d 404, 408 (1949); *see also State v. Stevens*, 718 P.2d 398, 399 (Utah 1986) (allowing regulation of vehicles and drivers under right to travel clause); *State v. Vlacil*, 645 P.2d 677, 680 (Utah 1982) (allowing regulation of weapons); *Utah State Road Comm'n v. Miya*, 526 P.2d 926, 928 (1974) (allowing regulation of property rights); *State v. Packard*, 122 Utah 369, 373–74, 250 P.2d 561, 563 (1952) (allowing regulation of strikes under right to work clause). The key, therefore, is to determine whether subsections 63–30–34(1)(a) and (b) constitute a reasonable regulation of Bott's article I, section 9 rights.

We have found regulations which are necessary to preserve the peace of society to be reasonable. *See, e.g., Vlacil,* 645 P.2d at 680 (explaining that state may regulate sale, use, and possession of firearms); *Slater,* 206 P.2d at 156 (explaining that legislative regulation of traffic does not violate right of interstate commerce); *International Union,* 203 P.2d at 409 (explaining that legislature may regulate free speech by prohibiting obscene and slanderous language and loud and boisterous speech in residential area at night).

Although defendants hardly addressed either the interests promoted by the subsections or the constitutionality of these subsections, we recognize that they were designed to preserve the government's ability to render critical government services by protecting the public treasury from unreasonable depletion. *See Blue Cross & Blue Shield v. State,* 779 P.2d 634, 637 (Utah 1989) (explaining that court may evaluate statutes on basis of statute's perceived objective). This interest, although sufficient to justify legislation impacting economic interests, is not paramount to the rights protected by article I, section 9 because it is not necessary to preserve social peace. Our research reveals no solid evidence that making full retribution to the few prisoners who will succeed in showing that prison employees acted with "deliberate indifference" or "unnecessary abuse," both difficult standards to prove, will deplete the state coffers. Moreover, courts that have evaluated statutory caps on damages awarded for the violation of constitutionally protected rights have found that the objectives of such statutes do not adequately justify them. *Wright v. Central Du Page Hosp. Ass'n,* 63 Ill.2d 313, 347 N.E.2d 736, 743 (1976); *Condemarin,* 775 P.2d at 356.

■■■ Next, we examine whether subsections 63–30–34(1)(a) and (b) unreasonably impair the right of prisoners to recover for the violation of their article I, section 9 rights. Imposing a statutory cap on damages is a crippling regulation of prisoners' right to recover under article I, section 9, *see Wright,* 347 N.E.2d at 743, and in light of the weakness of the statutory objective of subsections 63–30–34(1)(a) and (b), we conclude that these subsections constitute an unreasonable regulation of Bott's article I, section 9 rights. Thus, we hold that these subsections are invalid as applied to prisoners' claims under article I, section 9.

## IV. CONCLUSION

In sum, we hold that subsections 63–30–4(3) and (4) of the Utah Code, which provide that government employees cannot be liable for injuries in the absence of fraud or malice, are constitutional as applied to a prisoner's negligence claims against prison employees. We also conclude that the state constitutional provision against unnecessarily rigorous treatment of prisoners, article I, section 9, provides a basis for an award of monetary damages if a prisoner proves that a prison employee was deliberately indifferent to his medical needs or subjected him to clearly excessive or deficient and unjustified treatment. Finally, we hold that the statutory cap on damages is an unreasonable regulation of Bott's article I, section 9 rights.

The judgment below is reversed, and the case is remanded to the trial court to enter amended judgments against defendants on plaintiff's constitutional claim without regard to the statutory cap on damages.

ZIMMERMAN, C.J., and RUSSON, J., concur.

STEWART, Associate Chief Justice, concurring and dissenting:

I concur in the judgment and in the majority opinion with one exception. One of plaintiff's actions against Dean Laney, the nurse practitioner at the prison, was based on a claim of negligence. In my view, that claim was not barred by the doctrine of official immunity for the reasons set out in my dissenting opinion in *Ross v. Schackel,* 920 P.2d 1159 (Utah 1996), a companion case also issued today. The jury found that Laney was negligent. Because he was clearly acting in a ministerial capacity, he was not entitled to the protection of official immunity. Indeed, as to him I find it extraordinarily difficult to distinguish between negligence on the one hand and the deliberate indifference test the

Court applies under article I, section 9 of the Utah Constitution.

DURHAM, J., concurs.